UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BETTOR RACING, INC., and J. RANDY GALLO, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL INDIAN GAMING COMMISSION, <br><br> Defendant, <br><br> and <br><br> FLANDREAU SANTEE SIOUX TRIBE, <br><br> Intervenor. | CIV. 13-4051-KES <br><br> MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

Plaintiffs, Bettor Racing, Inc., and J. Randy Gallo, brought this suit under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, and the United States Constitution, against defendant, National Indian Gaming Commission (NIGC). Plaintiffs ask this court to set aside the NIGC's final decision and order in its entirety or, alternatively, to set aside the portion of the final decision and order that assessed a civil fine against plaintiffs. The Flandreau Santee Sioux Tribe has intervened. Docket 35. The parties have filed cross motions for summary judgment.[1] For the following reasons, the NIGC's

---

[1] Plaintiffs also requested oral argument pursuant to D.S.D. Civ. LR 7.1. Docket 62 at 22; Docket 64 at 22. Because the court can resolve the pending motions for summary judgment without oral argument, plaintiffs' request is denied.

and Tribe's motions for summary judgment are granted, and plaintiffs' motion for summary judgment is denied.

## BACKGROUND

The undisputed facts are:

J. Randy Gallo is a resident of Jupiter, Florida, and the president of Bettor Racing, Inc., a corporation organized under the laws of the state of South Dakota. Bettor Racing is a parimutuel betting business.[2] The NIGC is an independent federal agency established by the Indian Gaming Regulatory Act of 1988 (IGRA).[3] The NIGC is charged with enforcing the IGRA and regulating tribal gaming. The Tribe is a federally recognized tribe that operates the Royal River Casino near Flandreau, South Dakota. The casino, which is located on tribal lands, is subject to the IGRA.

In 2003, Gallo and the Tribe met to discuss relocating Bettor Racing from its Sioux Falls, South Dakota, location to Royal River Casino, in part to avoid a state tax on parimutuel betting. In March 2004, Bettor Racing and the Tribe reached an agreement in the form of a management contract, which was submitted to the NIGC for approval. Following submission of the proposed agreement, the NIGC requested several changes, which the parties

---

[2] Parimutuel betting is "a form of betting and of handling the betting on horse races at racetracks, in which those holding winning tickets divide the total amount bet in proportion to their wagers, less a percentage for the management, taxes, etc." Dictionary.com, http://dictionary.reference.com/browse/parimutuel (last visited Aug. 19, 2014).

[3] 25 U.S.C. §§ 2701-2721.

subsequently incorporated. The NIGC approved the management contract on March 17, 2005.

On September 20, 2004, during the pendency of the management contract's approval, Bettor Racing and the Tribe entered into what was styled a "consulting agreement" under which Bettor Racing would assist the Tribe in running a parimutuel betting operation at Royal River Casino. A.R. 2009-10. On September 24, 2004, Bettor Racing began operation of the parimutuel betting business at Royal River Casino (under the name Royal River Racing) until the management contract was approved on March 17, 2005. Following approval of the management contract, Bettor Racing and the Tribe operated under its terms.

In 2005, the state of South Dakota reduced its tax on parimutuel gaming revenue. SDCL 42-7-102. Bettor Racing and the Tribe discussed the effect of the changes in South Dakota's tax structure as well as a possible relocation of Bettor Racing's business away from Royal River Casino. Bettor Racing and the Tribe subsequently agreed to modify the terms of the management contract in 2006 (first modification). This agreement was executed by Bettor Racing and the Tribe on February 15, 2007. A.R. 1558-1561.

On January 25, 2007, the first modification was submitted for approval to the NIGC. On April 13, 2007, the Tribe requested the NIGC to hold its review of the first modification in abeyance pending litigation between the Tribe and state of South Dakota. Consequently, the first modification was never approved by the NIGC.

3

In 2008, following increases in fees charged by racetracks to off-track betting operations, Bettor Racing and the Tribe discussed further modifications of the management contract (second modification). The second modification was executed by the parties on August 1, 2008. The second modification was not submitted to the NIGC, however, and was never approved.

In August 2009, the NIGC conducted a management contract compliance review. On August 27, 2009, the NIGC issued a notice of noncompliance to Bettor Racing. The notice of noncompliance stated that Bettor Racing had failed to pay to the Tribe the required percentage of gaming revenue as required by the terms of the original management contract and federal law. A.R. 31-33. Additionally, from August 2009 until May 2011, the NIGC conducted an investigation. This investigation culminated in the issuance of a Notice of Violation (NOV) to both the Tribe and Bettor Racing on May 19, 2011. The NIGC determined that Bettor Racing committed three violations of the IGRA, and the Tribe had committed four violations of the IGRA.

As part of the NOV, the NIGC ordered Bettor Racing to pay the Tribe $4,544,755. This amount represented what the NIGC determined the Tribe should have received during the years 2005, 2006, 2007, and 2008. During the summer of 2011, the Tribe reached a settlement with the NIGC. A.R. 2611-16.

On June 20, 2011, Bettor Racing appealed the NOV. The Tribe intervened in the administrative appeal. On February 10, 2012, the NIGC issued a Notice of Proposed Civil Fine Assessment (CFA) against Bettor Racing. A.R. 2665-73. The total amount of the proposed fine was $5 million. This

4

amount was independent of the assessment that Bettor Racing was ordered to pay the Tribe pursuant to the NOV. On March 9, 2012, Bettor Racing appealed the CFA. The Tribe also intervened in this administrative appeal. The original NOV and the CFA proceedings were consolidated into one appeal.

The chair for the NIGC and the Tribe each moved for summary judgment in the administrative appeal, which Bettor Racing opposed. On August 13, 2012, the presiding official issued her recommended decision granting the motions for summary judgment on the NOV and CFA in favor of the NIGC and Tribe. The Commission affirmed the presiding official's recommended decision in its final decision and order on September 12, 2012. The Commission determined, however, that the CFA of $5 million had "supplanted" the monetary remedy in the NOV. A.R. 3049.

In January 2013, the Tribe filed suit against plaintiffs in Flandreau Santee Sioux Tribal Court, alleging breach of contract and unjust enrichment. Docket 9-1, 9-2. Plaintiffs have counterclaimed in that action alleging fraud. On May 10, 2013, plaintiffs filed this suit against the NIGC seeking relief from the Commission's final decision and order. Docket 1. The Tribe moved to intervene on June 17, 2013. Docket 7. The Tribe's motion was granted on November 11, 2013. Docket 35.[4] Pending before the court are cross motions for summary judgment from all parties regarding the Commission's final decision and order.

---

[4] The Tribe's request for judicial notice was also granted in part, and the court took judicial notice of the fact that an action is pending in tribal court.

# I.

## LEGAL STANDARD

Generally a motion for summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000). A factual dispute that does not rise to the level of materiality will not preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910-11 (8th Cir. 2005). Rather, " 'the dispute must be outcome determinative under prevailing law.' " *Mosely*, 415 F.3d at 911 (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)).

The general standard set forth in Rule 56 does not apply where, as here, the parties are seeking this court's review of an administrative decision. Thus, this court is guided by the standards provided in the APA. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004); 5 U.S.C. § 706.

> Specifically, a motion for summary judgment . . . makes no procedural sense when a district court is asked to undertake judicial review of administrative action. Such a motion is designed to isolate factual issues on which there is no genuine dispute, so that the court can determine what part of the case must be tried to the court or a jury. Agency action, however, is reviewed, not tried. Factual issues have been presented, disputed, and resolved; and the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts.

*Lodge Tower Condominium Ass'n v. Lodge Properties, Inc.* 880 F. Supp. 1370, 1374 (D. Colo. 1995) (internal citations omitted); *see also North Carolina*

*Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007). Consequently, a motion for summary judgment at this stage requires this court to determine "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review" as a matter of law. *Brodie v. U.S. Dep't of Health & Human Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011).

Pursuant to the relevant standards set by the APA, this court will set aside an agency's action only if its decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Club v. E.P.A.*, 252 F.3d 943, 947 (8th Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). An agency decision fails the "arbitrary and capricious" standard if

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While this court's review of the facts before the agency is "searching and careful," the "standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). If the agency's decision "is supportable on any rational basis," it must be upheld. *Voyageurs*, 381 F.3d at 763 (citing *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d

7

1178, 1184 (8th Cir. 2001)). Deference is provided when an agency interprets a statute it administers. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Further deference is required when an agency interprets its own regulations. *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005).

Nonetheless, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). A reviewing court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," but may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285-86 (internal citations omitted). This court must confine its review to the administrative record as it existed at the time of the agency's decision, rather than a new record made for the first time before this court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Finally, an agency's imposition of sanctions is reviewed under the abuse of discretion standard. *Syverson v. U.S. Dep't of Agric.*, 601 F.3d 793, 800 (8th Cir. 2010).

**DISCUSSION**

Plaintiffs' primary contention is that the Commission acted arbitrarily and capriciously by failing to consider disputed, material facts that should have precluded summary judgment in favor of the NIGC chair and Tribe regarding the NOV as well as the CFA. Plaintiffs also contend they were denied certain procedural rights during the agency proceeding. The NIGC and Tribe

8

assert that summary judgment was appropriate and plaintiffs have not met their burden to overturn the Commission's decision.

## A.    IGRA Violations

Congress enacted the IGRA to provide "the statutory basis for operating and regulating Indian Gaming." *Colombe v. Rosebud Sioux Tribe*, 918 F. Supp. 2d 952, 956 (D.S.D. 2013) (citing *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1092, 1094 (8th Cir. 1999). The IGRA is designed to promote "tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Additionally, Congress sought to ensure that Indian tribes would be the primary beneficiaries of Indian gaming operations. § 2702(2); *see also Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 700 (7th Cir. 2011) ("One of IGRA's principal purposes is to ensure that the tribes retain control of gaming facilities set up under the protection of IGRA and of the revenue from these facilities."); *Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n*, 803 F. Supp. 2d 1198, 1205 (D. Nev. 2011) (explaining IGRA was meant to shield tribes "from organized crime and other corrupting influences."). The NIGC was established to develop regulations that promote Congress's goals, and, as an administrative body, to enforce the IGRA. 25 U.S.C. § 2702(3); *United States v. Seminole Nation of Oklahoma*, 321 F.3d 939, 941 (10th Cir. 2002).

The IGRA and NIGC regulations permit tribes to enter management contracts for gaming operations, but only if such contracts have been approved by the chair of the NIGC. 25 U.S.C. § 2711(a)(1); 25 § C.F.R. 533.1; *see also*

*Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1420 (8th Cir. 1996) (explaining "the NIGC has exclusive authority to determine a contract's compliance with IGRA and its regulations[.]"). The phrase "management contract" includes "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15.

Before a management contract can be approved, it must meet certain criteria. For example, management contracts typically are limited in duration to five years, and the IGRA restricts management fees to no more than 30 percent of net revenues, unless certain conditions are present. 25 U.S.C. §§ 2711(b)(5),(c). Even if those conditions are present, however, management fees cannot exceed 40 percent of net revenues. *Id.* § 2711(c)(2). "Net revenues" are further defined as "gross revenues of an Indian gaming activity less amounts paid out as, or paid for, prizes and total operating expenses, excluding management fees." 25 U.S.C. § 2703(9).

Management contracts that have not been approved by the NIGC are void. 25 C.F.R. § 533.7; *Missouri River Servs., Inc. v. Omaha Tribe of Nebraska,* 267 F.3d 848, 853 (8th Cir. 2001); *Turn Key Gaming*, 164 F.3d at 1094. Subject to NIGC approval, a tribe may amend an approved management contract. 25 C.F.R. § 535.1(a). Any attempted amendment that does not comply with the IGRA or NIGC requirements, or that is not approved by the NIGC, is also void. 25 C.F.R. § 535.1(f); *Missouri River Servs.*, 267 F.3d at 853; *Turn Key*

*Gaming*, 164 F.3d at 1094. A proposed amendment must be submitted to the NIGC within 30 days of execution. 25 C.F.R. § 535.1(b).

The NIGC is empowered to levy and collect civil fines against tribal operators or management contractors who violate IGRA, NIGC regulations, or approved tribal ordinances, regulations, or resolutions. 25 U.S.C. § 2713(a)(1); *United States v. Santee Sioux Tribe of Nebraska*, 135 F.3d 558, 563 (8th Cir. 1998). The NIGC may impose such fines up to $25,000 per violation. 25 U.S.C. § 2713(a)(1); 25 C.F.R. § 575.4. NIGC regulations further specify which factors to consider in assessing whether a fine is imposed, as well as if "each daily illegal act or omission will be deemed a separate violation[.]" 25 C.F.R. § 575.3; 25 C.F.R. § 575.4. Tribes or individuals subject to notices of violations or civil fine assessments may appeal. 25 C.F.R. §§ 584.2(a); 585.2(a). A party may request a hearing or elect to have the NIGC dispose of the appeal by written submissions. 25 C.F.R. §§ 584.3; 585.3. The NIGC's final decision is subject to judicial review. 25 U.S.C. § 2714.

### i.  First Violation–Managing an Indian Gaming Operation Without an Approved Management Contract

In its final decision and order, the Commission agreed with the presiding official's conclusion that plaintiffs "violated IGRA and NIGC regulations by managing Royal River Racing without an approved management contract from September 24, 2004 to March 17, 2005." A.R. 3051. The Commission concluded Gallo had been operating Royal River Racing without an approved management contract at that time, and that Gallo was the manager of Royal River Racing. *Id.* The Commission agreed that there were no disputes of

11

material fact and awarded summary judgment in favor of the NIGC and Tribe. *Id.*

Plaintiffs do not take issue with the Commission's conclusion that it was acting without an approved management contract during this time frame. Docket 53 at 12 (acknowledging "it is true that the dates on which Bettor Racing began to operate at the Casino are uncontroverted[.]"). Rather, plaintiffs contend that "the inquiry does and cannot end there." *Id.* Specifically, plaintiffs argue that the Commission's failure to consider the states of mind of the parties to determine if the IGRA or NIGC regulations were violated was arbitrary and capricious. *See, e.g.*, *id.* at 13-17; Docket 62 at 5-7; Docket 64 at 5-6. The NIGC and Tribe submit that the Commission was correct to conclude that any evidence related to a party's mental state is immaterial. *See, e.g.*, Docket 57-1, at 15-18; Docket 59 at 22-26.

In support of their assertion, plaintiffs cite several cases involving criminal offenses that require some showing of scienter. For example, *Carter v. United States,* 530 U.S. 255, 268-70 (2000), is cited for the proposition that criminal statutes presumptively favor some *mens rea* requirement.[5] Likewise, *Bryan v. United States* 524 U.S. 184, 191 (1998), and *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994), explain what must be shown to establish a defendant acted "willfully" in violation of a statute. Several circuit court

---

[5] Plaintiffs indicate that the *Carter* Court held "intent to do the things that constitute elements of the offense is required[.]" Docket 53 at 13 (quoting 530 U.S. at 268-70). This court is unable to locate this quoted language in the Supreme Court's opinion.

opinions are cited to show a defendant's good faith may negate the specific intent requisite to commit certain crimes. *United States v. McNair*, 605 F.3d 1152, 1201 n.65 (11th Cir. 2010) (mail fraud); *United States v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007) (obstruction); *United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985) (filing false statements).

While it is true that a conviction of most criminal prohibitions requires an inquiry into a defendant's mental state, plaintiffs have not been charged with violating a criminal offense. Reference to *Carter* in this context is therefore inapposite. Moreover, in a section aptly titled "Civil penalties," the NIGC has been given the authority to "levy and collect appropriate civil fines" against a tribal operator or management contractor "engaged in gaming for any violation of any provision of this chapter[.]" 25 U.S.C. § 2713(a)(1). Unlike the criminal statutes at issue in *Bryan* and *Ratzlaf*, the civil sanctions authorized by the IGRA do not require the showing of a "willful" violation. *Ratzlaf* also acknowledges that Congress may provide for civil forfeitures without a showing of "willfulness" if it so chooses. 510 U.S. at 146 n.16. The other criminal cases cited by plaintiffs do not address whether a showing of good faith is relevant in the context of an IGRA violation. As the Commission's final decision and order explained, plaintiffs have "cited no statutory or regulatory provision, no legislative history, no provision in the Tribe's gaming ordinance, and no agency or judicial case law interpreting IGRA" that necessitates a finding of "intent to deceive or violate the law to establish the violations." A.R. 3050. Here, too, plaintiffs have not shown that anything in the IGRA or NIGC regulations

13

undermine the Commission's conclusion, and plaintiffs have not provided any judicial authority to the contrary.

Additionally, as the NIGC contends, even if the IGRA or NIGC regulations were ambiguous regarding whether scienter needed to be shown, the agency's interpretation of the IGRA or its own regulations are entitled to deference. *See Chevron,* 467 U.S. at 842-43. As the Supreme Court has instructed, this court must ask two questions when reviewing an agency's construction of a statute it administers–namely, "whether Congress has directly spoken to the precise question at issue," and, if not, "whether the agency's answer is based on a permissible construction of the statute." *Id.* Regarding the first inquiry, none of the parties contend that Congress has directly spoken on the scienter question. With respect to the second inquiry, however, the Commission observed that management contracts not approved by the NIGC are void under the IGRA, thus the Commission agreed with the presiding officer that "[f]ailure to obtain the Chair's approval of a management contract prior to operation under such a contract is a per se violation of IGRA." A.R. 3051(citing 25 U.S.C. § 2713). The court is not convinced that the Commission's interpretation of the IGRA is impermissible. Therefore, its interpretation is entitled to deference.

Plaintiffs argue that by relying on representations from tribal officials who drafted and presented the management contract and allegedly indicated that nothing prohibited them from beginning operations, plaintiffs had no reason to believe they were in violation of the law during the period of September 24, 2004, to March 17, 2005. Docket 53 at 14-15. Additionally,

14

plaintiffs argue that payments were made to the Tribe as required under the management contract while approval was pending. Docket 53 at 3. Assuming these facts are true, however, would not change the Commission's analysis because plaintiffs have not presented any evidence to show that a party's reliance is relevant in the context of operating without an approved management contract. Further, even if plaintiffs complied with the unapproved contract's terms, the contract had no legal effect without the NIGC's approval. 25 U.S.C. § 2711(a)(1).

In conclusion, the court agrees with the NIGC and Tribe that the IGRA and NIGC regulations do not require a showing of scienter in order to establish a violation. Further, plaintiffs have not presented relevant evidence to show that good faith may be an affirmative defense to avoid sanctions for violating the IGRA. While plaintiffs' state of mind and representations of the Tribe may be questions of fact, they were not questions of material fact regarding whether plaintiffs operated Royal River Racing without an approved management contract. Instead, as the Commission concluded, the only relevant inquiry was whether in fact plaintiffs had so operated Royal River Racing. The record indicates plaintiffs operated Royal River Racing from September 24, 2004, to March 17, 2005, without an approved management contract. Therefore, the court finds that the Commission did not act arbitrarily or capriciously with respect to the first violation.

### ii.   Second Violation–Operating Under Two Unapproved Modifications to an Approved Management Contract

The presiding official concluded, and the Commission agreed, that plaintiffs operated Royal River Racing pursuant to two unapproved modifications to the management contract from February 15, 2007, to December 31, 2009, in violation of IGRA and NIGC regulations. A.R. 3052. As detailed above, the original management contract was approved by the NIGC on March 17, 2005. Bettor Racing and the Tribe executed the first modification to the management contract on February 15, 2007. A second modification was executed on August 1, 2008. Neither modification was approved by the NIGC. The Commission agreed with the presiding official that there were no genuine disputes of material fact regarding this violation and awarded summary judgment in favor of the NIGC and Tribe. *Id.*

Plaintiffs argue that the Commission acted arbitrarily and capriciously by ignoring disputed, material facts related to this issue–namely, plaintiffs' knowledge and intent to violate the law. *See* Docket 53 at 17. The NIGC and Tribe similarly oppose plaintiffs' argument, contending this factual issue was not material to the Commission's determination of whether a violation occurred. *See* Docket 57-1 at 18-19; Docket 59 at 15.

According to plaintiffs, the Tribe proposed and prepared both modifications and assumed the responsibility to submit the modifications to the NIGC for approval, and it bears responsibility for the ultimate lack of NIGC approval with respect to both modifications. Docket 53 at 17-20. Further, plaintiffs argue that it was reasonable for Bettor Racing to believe it was

16

compliant with all applicable laws and regulations, and that the Tribe received everything it was guaranteed under the modifications and federal law. Docket 64 at 9; Docket 53 at 18, 19. Plaintiffs also assert the Tribe had spoken with former NIGC chair Phil Hogen who took no issue with the proposed modifications. Docket 62 at 7-8. Plaintiffs conclude the Commission erred because it "fail[ed] to consider an important aspect of this problem." Docket 62 at 10-11 (citations omitted).

First, as above, plaintiffs have not provided any legal authority supporting their contention that a party's state of mind, intent, good faith, or reliance is a relevant inquiry into the question of whether a party has managed a gaming operation pursuant to an unapproved amendment to a management contract. The chair must approve all contracts for the management of Indian gaming operations. 25 U.S.C. § 2711(a)(1); 25 C.F.R. § 533.1; *Turn Key Gaming Inc. v. Oglala Sioux Tribe*, 164 F.3d 1092, 1094 (8th Cir. 1999). Additionally, amendments to approved management contracts must also be submitted and approved by the chair. 25 C.F.R. § 535.1; *Turn Key Gaming*, 164 F.3d at 1094. Any attempted modification of an approved management contract without chair approval is void. C.F.R. §§ 533.7; 535.1(f)); *United States ex rel Bernard v. Casino Magic Corp*, 293 F.3d 419, 424 (8th Cir. 2002). Consistent with the first violation, the Commission concluded that failure to obtain approval from the chair prior to operation is a *per se* violation of IGRA. A.R. 3051. Because unapproved contracts are void and because no scienter requirement must be shown to establish a violation of the IGRA, the Commission concluded that

17

plaintiffs' reliance was not a defense to the violation. *Id.* (finding "no reasonable basis for an expectation that anything but the NIGC's formal written approval could authorize the operation[.]"). As with the first violation, the court finds that the Commission's interpretation of IGRA or NIGC regulations is permissible.

Second, a large portion of the parties' briefs discusses the propriety of a so-called "bonus" payment between the Tribe and Bettor Racing, which was a focal point of the modifications, and whether the former NIGC chair Phil Hogen verbally approved the arrangement. *See, e.g.*, Docket 53 at 18; Docket 59 at 13; Docket 62 at 7-8; Docket 64 at 7-8. Under the "bonus" arrangement, plaintiffs and the Tribe would exchange checks–the first check from the plaintiffs to the Tribe for the full amount due under the approved management contract, and the second from the Tribe to plaintiffs to make up the difference under the unapproved modifications. A.R. 3047. Even if the court concludes that the conversation between Hogen and Tribal counsel Terry Pechota is true and admissible,[6] it would not change the outcome. According to Pechota's deposition, he met with Hogen in Arizona during an NIGC "trade show." A.R. 727. Although it is unclear whether Pechota provided the specifics of the

---

[6] As the Eighth Circuit has explained, "The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). Additionally, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The court notes that the NIGC and Tribe have objected to this evidence as inadmissible hearsay, but reserves ruling on this objection. *See e.g.*, Docket 59 at 27; Docket 68 at 8, n.1.

proposed arrangement to Hogen, Pechota asked if a bonus could be paid by the tribe. A.R. 728. Hogen is said to have responded affirmatively, but also that it was only "[his] opinion[,]" that "it shouldn't be kept a secret," and that "the National Indian Gaming Commission should be kept aware." *Id.* At best, this appears to be the informal opinion of Hogen that, in the abstract, a bonus arrangement could be permissible. Pursuant to NIGC regulations, however, the parties were required to follow submission guidelines of all proposed amendments, and approval could only be evidenced by a signed and dated document from the chair. C.F.R. §§ 535.1(c); 533.1(b). The court agrees with the Commission's conclusion that "oral representations cannot relieve a party of its obligation to comply with statutes and regulations." A.R. 3051.

Finally, the Commission did not fail to consider the arguments raised by plaintiffs, but instead agreed with the presiding official that those facts, even if true, were not material. A.R. 3051 ("The Commission is also not aware of any source of law that would relieve [plaintiffs] of responsibility even if what they allege were true."). Like the first violation, the second violation does not turn on whether plaintiffs knew or intended to violate the IGRA, but whether in fact plaintiffs managed Royal River Racing pursuant to two unapproved amendments to an approved management contract from February 15, 2007, to December 31, 2009. The record supports the Commission's conclusion that plaintiffs did so operate Royal River Racing. Plaintiffs do not dispute this finding; rather, plaintiffs contend they did not intend to violate the law or that the Tribe was more blameworthy. These assertions, however, are not material

19

to this issue. Therefore, the court finds that the Commission did not act arbitrarily or capriciously with respect to the second violation.

> ### iii.   Third Violation–Possessing a Proprietary Interest in a Tribal Gaming Operation

The Commission agreed with the presiding official that plaintiffs had a proprietary interest in Royal River Racing in violation of the IGRA. A.R. 3054. Pursuant to the IGRA, Indian tribes must possess the " 'sole proprietary interest' in any Indian gaming activity authorized by the act, as well as the exclusive control and responsibility for it." *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1150 (8th Cir. 2013) (citing 25 U.S.C. § 2710(b)(2)(A)); *see also* 25 U.S.C. § 2702(2); 25 C.F.R. §§ 522.4(b)(1); 522.6(c). The IGRA caps management fees at 30 percent of net revenues, unless certain conditions are met in which case the management fees are not to exceed 40 percent of net revenues. 25 U.S.C. § 2711(c). The Tribe has passed two gaming ordinances, one specifically aimed at parimutuel betting, which reiterate the "sole proprietary interest" requirement. A.R. 2384 (Flandreau Gaming Ordinance § 17-6-1); A.R. 2402 (Flandreau Pari-mutuel Betting Ordinance).

The Commission explained that the NIGC uses a three-factor approach to determine whether a tribe has the sole proprietary interest in an Indian gaming operation: "1) the term of the relationship; 2) the amount of revenue paid to the third party; and 3) the right of control provided to the third party over the gaming activity." A.R. 3052; *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 830 F. Supp. 2d 712, 723 (D. Minn. 2011), *aff'd in part,*

20

*rev'd in part*, 702 F.3d 1147 (8th Cir. 2013). As the Commission observed, only the factors concerning revenue and control were of consequence here. A.R. 3052.

### a.    Revenue

Regarding the revenue factor, the Commission concluded that from 2004 to 2007, plaintiffs received an amount of revenue in excess of the 40 percent cap by way of the "bonus" (or "check-swap") scheme discussed above. A.R. 3053. The Commission calculated that, under this arrangement, plaintiffs had received from 65 percent to 78 percent of revenues during the 2004 to 2007 period. *Id.* This, the Commission determined, was a share of the revenues "far beyond what is permissible under IGRA." *Id.*

Plaintiffs do not dispute the ultimate calculations regarding revenue sharing found by the Commission, but instead argue that the IGRA does not prohibit the "bonus" arrangement which led to those figures. *See, e.g.*, Docket 53 at 23 ("There is nothing in the NIGC or IGRA regulations that precludes the giving of a bonus."). Additionally, plaintiffs argue that the Tribe exercised its own discretion to issue the "bonus" payments, and that it received all the revenue due to it under the approved management contract, the unapproved modifications, and the IGRA. *Id.* Plaintiffs further argue that IGRA and NIGC regulations permit Tribes to use their revenue for certain purposes, such as "to promote tribal economic development." *Id.* at 24; Docket 64 at 12 n. 3 (citing 25 U.S.C. § 2710(b)(2)(B)). Moreover, plaintiffs again argue that former NIGC chair Phil Hogen verbally consented to the arrangement. Docket 53 at 24.

First, the IGRA explicitly forbids anyone other than the Tribe from having a proprietary interest in the gaming operation. 25 U.S.C. § 2710(b)(2)(A).[7] The IGRA further restricts the amount of net revenue that can be paid to the managing operator to no more than 30 percent or, if certain circumstances are met, no more than 40 percent. 25 U.S.C. § 2711(c). The Commission concluded that, by way of the "bonus" payment, plaintiffs had received an amount of revenue in excess of that permitted under the IGRA. A.R. 3053.

According to the Commission's interpretation of the statutes, plaintiffs could not use the "bonus" arrangement "to increase the flow of money to [plaintiffs] beyond the 40% permitted by IGRA." *Id.* As discussed above, the agency's interpretation of the statute is entitled to deference. *See Chevron,* 467 U.S. at 842-43. This court must ask two questions when reviewing an agency's construction of a statute it administers–specifically, "whether Congress has directly spoken to the precise question at issue," and, if not, "whether the agency's answer is based on a permissible construction of the statute." *Id.* Here, it appears Congress has directly spoken to this issue, that is, whether a management contractor can receive a percentage of revenue beyond the cap set by the IGRA. Congress specifically mandated that a management contractor cannot receive more than a 40 percent share of net revenue. *See* 25 U.S.C. § 2711(c)(2). The congressional history of the IGRA also supports this conclusion. S. Rep. No. 100-446, at 15 (1988) ("The Committee . . . insist[s]

---

[7] The IGRA does provide an exception to this rule regarding certain Class II gaming activities. 25 U.S.C.§ 2710(b)(4). This exception, and the restrictions that accompany the exception, are not before the court.

that certain minimum standards be met by non-Indians when dealing with Indians. . . . the members of the Committee believe that term of years and fee percentages set forth in the bill are adequate to protect any legitimate potential investor."). Alternatively, even if Congress has not directly spoken to this issue, this court would defer to the agency's construction of the statute, as it appears to be rational. *See Chevron*, 467 U.S. at 843. Therefore, although the IGRA does not explicitly forbid Tribes from issuing a "bonus" payment to a managing operator, the court agrees with the Commission that the IGRA's cap on managing operator fees cannot be exceeded by way of a "check-swap" or "bonus" arrangement.

Second, regarding whether the payment by the Tribe was discretionary, the Commission found "[Plaintiffs] made the check-swap scheme a mandatory prerequisite to maintaining Royal River Racing at the Tribe's Casino, eliminating the Tribe's discretion to determine the payment amount." A.R. at 3053 (citing the administrative record). Plaintiffs dispute the Commission's factual findings that the "bonus" payment was discretionary, predominantly through citations to statements made by tribal counsel Terry Pechota regarding his view that the Tribe had the ability to do what it wanted with its money. *See, e.g.*, Docket 64 at 12 (citing A.R. 726-27, 727 (Deposition of Terry Pechota); A.R. 170 (Fax from Terry Pechota); A.R. 976 (same); A.R. 1513 (same); A.R. 2051 (same); A.R. 2227 (email from Terry Pechota); A.R. 2644-45 (notice of

docketing);[8] A.R. 1927-29 (Deposition of Randy Gallo)). According to Gallo's own testimony, however, these payments were not viewed as discretionary. A.R. 1893-94 ("[The check swap] wasn't discretionary as far as the amendments go. . . . if they're not going to swap checks I'll be leaving."). The agency's determination that the check-swap was not discretionary is supported by the record and by "a 'rational connection between the facts found and the choice made.' " *Bowman Transp. Inc., v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Therefore, the court finds that the Commission was not arbitrary or capricious in making this determination.

Third, plaintiffs contend that the IGRA would permit the "bonus" arrangement as a means of "promot[ing] tribal economic development." Docket 53 at 24 (citing 25 U.S.C. § 2710(b)(2)(B)(iii)).[9] In a section entitled "The Remedial Measure," wherein plaintiffs were to reimburse the Tribe for diverted revenue under the "bonus" arrangement, the presiding official agreed with the NIGC chair's contention that, even assuming the bonus was discretionary, that "does not change the unchallenged fact that [Plaintiffs] profited more than the Tribe, or change the equally unchallenged fact that unapproved modifications are null and void *ab initio*." A.R. 3032. The presiding official also agreed with

_____

[8] Plaintiffs cite to this portion of the administrative record several times in support of their argument that Pechota believed the check-swap was permissible. *See* Docket 53 at 22; Docket 62 at 12; Docket 64 at 12. This portion of the record, however, appears to be an order from the presiding official to appoint a mediator regarding a possible a settlement between plaintiffs and the Tribe. It is unclear what this order has to do with any statements made by Pechota.

[9] Plaintiffs also argue that the issue was never analyzed by the NIGC. Docket 64 at 11-12. For the reasons that follow, this court disagrees.

the Tribe's argument that the effect of the agreement would undermine the IGRA's statutory cap on management fees that "protects tribes' right to be the primary beneficiaries of their gaming operations." A.R. 3033. Because the remedial measure had been "supplanted" by the civil fine assessment, the Commission appears to have considered this issue in its discussion regarding the propriety of the civil fine assessment itself and agreed with the presiding official. A.R. 3056.

As discussed, the record supports the Commission's determination that the "bonus" payment was not done at the discretion of the Tribe, but rather was a mandatory condition of the contract modifications. Additionally, the unapproved modifications to the management contract that were the genesis of the "bonus" agreement were void without NIGC approval. But even ignoring these deficiencies, the court finds that the agency's decision that the check-swap arrangement was improper is not arbitrary and capricious. While this court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," it may still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc., v. Arkansas-Best Freight Sys. Inc.,* 419 U.S. 281, 285-86 (1974) (internal citations omitted). The Commission's decision that this arrangement was improper is premised on the provisions of the IGRA which are designed to protect tribes from outsiders, to ensure that tribes would be the primary beneficiaries of tribal gaming operations, to require NIGC approval of all management contracts and modifications, and to cap management fees at a certain level. *See*

25

25 U.S.C. §§ 2702; 2711. To allow the check-swap arrangement–which the Commission found not to be discretionary and not approved by the NIGC–to bypass those provisions in the name of "economic development" would undermine the purpose of the IGRA. The court concludes that this interpretation of the IGRA is permissible.

Finally, for reasons already discussed, plaintiff's argument that former NIGC chair Phil Hogen verbally approved the agreement is without merit. At best, Pechota's testimony recalling his conversation with the former chair indicates Hogen's opinion that, in the abstract, a bonus could be paid. It does not provide approval for an arrangement that could eliminate the Tribe's minimum share of revenue mandated by the IGRA, nor does it eliminate with the formal approval process needed to amend a management contract. For this reason and the reasons stated above, the court therefore agrees with the Commission that plaintiffs received an improper amount of revenue under the IGRA.

### b.   Control

With respect to the control factor, the Commission concluded plaintiffs had "controlled Royal River Racing, running it as a business separate from the Casino." *Id.* The Commission found plaintiffs admitted to owning Royal River Racing apart from the casino, held the simulcast license in Bettor Racing's name, had sole access to Royal River Racing's betting information provided by United Tote,[10] had audited Royal River Racing independently from the casino

---

[10] Described as "a pari-mutuel betting service provider." A.R. 3053.

by a firm plaintiffs hired, employed their own accountants, considered their employees separate and distinct from other casino employees and provided discretionary bonuses to them, and had reimbursed the casino for providing Royal River Racing employees food and drink discounts that were otherwise only given to casino employees. *Id.* (citing the administrative record). The Commission acknowledged plaintiffs' contentions that the IGRA did not forbid the management contracts, that the Tribe was aware of the arrangement, and that the Tribe had access to parts of Royal River Racing. *Id.* at 3054. Nonetheless, the Commission agreed with the presiding official that these arguments were either without merit or did not raise a genuine dispute of material fact, and it granted summary judgment in favor of the NIGC and Tribe. *Id.*

Countering the Commission's findings, plaintiffs argue that the Commission ignored other facts in the record. For example, plaintiffs contend it was error for the Commission to equate ownership with a proprietary interest. Docket 53 at 22. Further, plaintiffs argue that the IGRA does not preclude management agreements between tribes and operators, and that the IGRA does not define what is meant by "management." *Id.* According to plaintiffs, the Tribe's counsel prepared and drafted the agreement, and the Tribe was aware of the agreement and had access "to Royal River Racing's facilities, its books, its safe and its general operations at any time it desired." *Id.* at 23. Additionally, the Tribe interacted frequently with Bettor Racing personnel. *Id.*

First, while the Commission did consider plaintiffs' admission of ownership in its determination, the Commission did not equate plaintiffs' statement of ownership alone with a sole proprietary interest. Instead, as the NIGC and Tribe argue, plaintiffs' ownership was only one of a number of factors the Commission took into consideration. *See e.g.*, Docket 57-1 at 23; Docket 67 at 8. The Commission itself noted that plaintiffs' "statements of ownership do bear on the analysis of sole proprietary interest, as it speaks to the level of control." A.R. 3054. Only after considering the Commission's numerous findings of control did it conclude plaintiffs "admittedly exercised near total control of Royal River Racing, such as an owner would, and such control is impermissible under IGRA." *Id.*

On this point, plaintiffs contend that their ownership of Royal River Racing was necessary. Docket 64 at 14. Plaintiffs argue that the Tribe was ineligible for the licenses required to operate a parimutuel business. *Id.* (citing A.R. 1836:9-12 (Deposition of Randy Gallo)). This part of Gallo's testimony, however, observes that "[the Tribe] couldn't own it . . . they had no license with racing associations." A.R. 1836. While it may be true that the Tribe could not own Royal River Racing for present lack of a license, this does not mean the Tribe was ineligible to obtain such a license. Additionally, as the NIGC argues, "Plaintiffs do not identify any 'necessity' exception to this factor." Docket 68 at 8-9.

Second, plaintiffs are correct that the IGRA allows for tribes to enter into management agreements with non-Indians. *See* 25 U.S.C. § 2711. But, as

already discussed, there are numerous limitations to those contracts, such as the amount of compensation the management operator can be paid as well as the level of control they may exert. While the IGRA does not define the terms "management" or "manager" with particularity,[11] the NIGC's interpretation of that term would be entitled to deference. *Chevron,* 467 U.S. at 842-43; *see also Casino Magic Corp.*, 293 F.3d at 425; *Three Affiliated Tribes*, 93 F.3d at 1418 n. 10 (noting "that a permissible agency interpretation [of IGRA's terms] would merit considerable deference."). While the agency may permissibly conclude plaintiffs were managing Royal River Racing, it is not simultaneously precluded from also determining whether a managing operator holds a proprietary interest in the operation by exerting excessive control over the operation.

Finally, plaintiffs cite testimony from Gallo stating that the Tribe had some access to parts of Royal River Racing, as well as interaction with Bettor Racing personnel. Docket 53 at 23 (citing A.R. 1858; 2168-69 (Deposition of Randy Gallo)). The presiding official concluded that "the Tribe's access to information or interactions between OTB personnel and Casino personnel, without more, does not establish a genuine issue of material fact regarding ownership and control" of the operation. A.R. 3032. In its final decision and order, the Commission agreed. A.R. at 3054. The Commission concluded plaintiffs' allegations, if true, would not "change the admission he owned, controlled, managed, and operated Royal River Racing." *Id.* The court agrees,

---

[11] NIGC regulations define a "Person having management responsibility for a management contract" as "the person designated by the management contract as having management responsibility for the gaming operation, or a portion thereof." 25 C.F.R. § 502.18.

and finds the Commission did not act arbitrarily or capriciously with respect to its determination.

By considering the two relevant factors–revenue and control–the Commission concluded plaintiffs held a proprietary interest in Royal River Racing in violation of IGRA. A.R. 3054. Reviewing the record, the court concludes the agency has made a rational connection between the facts found and the choice made. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citation omitted). Therefore, the court cannot agree that the Commission acted arbitrarily or capriciously with regards to the third violation.

### iv.    Civil Fine Assessment

As discussed, the NIGC is empowered to levy and collect civil fines up to $25,000 against a managing operator for each violation of the IGRA, NIGC regulations, or Tribal ordinances, regulations, or resolutions approved by the NIGC. 25 U.S.C. § 2713(a)(1). NIGC regulations provide a set of factors the agency follows in order to assess whether a fine will be imposed and the amount of the fine itself. 25 C.F.R. § 575.4. The factors are: (1) the economic benefit of noncompliance; (2) the seriousness of the violation; (3) whether there has been a history of violations; (4) negligence or willfulness; and (5) good faith compliance following notification of the violation. *Id.* The agency may consider whether ongoing violations are to be deemed separate violations when determining the total amount of the fine. 25 C.F.R. § 575.3. With regard to the third factor–a history of violations–the Commission found there was no prior

history of violations by plaintiffs, and this was considered by the Commission and the presiding official. A.R. 3057.

The NIGC weighed the four applicable factors to determine the appropriate fine for each of the violations discussed above, and assessed a total fine of $5 million. Plaintiffs contend that the agency improperly evaluated each of factors and ignored additional facts. Docket 53 at 27. This court must afford the NIGC substantial deference to the interpretation of the agency's own regulations. *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005).

### a.    Economic Benefit of Noncompliance

The first factor asks whether "the respondent obtained an economic benefit from the noncompliance that gave rise to a notice of violation, as well as the likelihood of escaping detection." 25 C.F.R. § 575.4(a). The Commission agreed with the presiding official's calculation that, as a result of the violations discussed above, plaintiffs received an economic benefit of at least $4,544,755 during its period of noncompliance. A.R. 3055.[12] This amount represented what the Tribe should have received under the terms of the approved management contract. A.R. 3032.

Plaintiffs do not deny receiving an economic benefit from its noncompliance or contest this calculation. Rather, plaintiffs argue the

---

[12] Plaintiffs did remit $1,081,578 to the Tribe, which would bring the total balance outstanding to $3,463,177. A.R. 3032. At the time the NOV was issued, however, the agency did not have the records necessary to calculate any additional economic benefit plaintiffs' may have received between fiscal year 2009 and April 5, 2010. A.R. 3055 n.2.

Commission failed to consider plaintiffs' lack of intent to violate the law, the fault of the Tribe in failing to submit the modifications for approval, that the Tribe received what it had contracted for, and that there is no law precluding the "bonus" payments. Docket 53 at 27. Plaintiffs also assert that both they and the Tribe received an economic benefit. *Id.* at 28.

The agency concluded these factual assertions were irrelevant to either the inquiry of whether plaintiffs received an economic benefit from noncompliance or the amount of that benefit. A.R. 3056. The court agrees with the agency's conclusion with respect to these factors, although it notes that some of plaintiffs' assertions may be relevant to the factor pertaining to plaintiffs' negligence or willfulness and will consider them in that context.

### b.   Seriousness of the Violation

The second factor allows the NIGC to adjust the amount of the fine "to reflect the seriousness of the violation," and mandates that the chair "consider the extent to which the violation threatens the integrity of Indian gaming." 25 C.F.R. § 575.4(b). The presiding official noted the NIGC regulations provide that the operation of an Indian gaming establishment without an approved management agreement is deemed a "substantial violation." A.R. 3036.[13] Additionally, because the NIGC chair was directed to consider "the extent to which the violation threatens the integrity of Indian gaming," the presiding official agreed with the chair's determination that violation of the IGRA's sole

---

[13] At the time of the presiding official's review, the regulation was designated as 25 C.F.R. § 573.6(a)(7). Since that time, the regulation has been renumbered to 25 C.F.R. § 573.4(a)(7).

proprietary interest requirement was also serious. *Id.* (quoting 25 C.F.R § 575.4(b)). Though not explicitly cited as such, the first consideration appears to be based upon the IGRA's mandate that all management contracts be approved by the NIGC chair prior to operation, and the second on IGRA's purpose that tribes remain the primary beneficiaries of Indian gaming. 25 U.S.C. §§ 2711; 2702(2). The Commission nonetheless adopted the presiding official's conclusions. A.R. 3056.

Plaintiffs counter that the agency ignored the Tribe's role in drafting and presenting the agreements between the parties, that the Tribe approved each agreement between the parties, and that Gallo was unaware that he was violating any IGRA or NIGC regulation. Docket 53 at 27-28. The Commission concluded these assertions did not address the seriousness of plaintiffs' own violations. A.R. 3056. The court agrees and, as with the previous factor, notes that these assertions may more properly be considered regarding plaintiffs' negligence or willfulness and will be addressed below.

Plaintiffs also contend that while operation of an Indian gaming establishment without an approved management agreement is "substantial," the term is not a corollary of the word "serious." Docket 62 at 17; Docket 64 at 16. In support of this argument, plaintiffs cite *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 (1996), for the proposition that "some wrongs are more blameworthy than others." Docket 62 at 17. *Gore*, however, was describing the relationship between a jury award of punitive damages and the "degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. The

33

imposition of punitive damages is not before the court. Moreover, the court gives deference to the agency's interpretation of its own regulations, and plaintiffs have not presented any evidence that the agency's equivalence of "substantial" and "serious" is " 'plainly erroneous or inconsistent with the regulation.' " *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005) (quoting *Coalition for Fair & Equitable Reg. of Docks on Lake of the Ozarks v. F.E.R.C.*, 297 F.3d 771, 778 (8th Cir. 2002)). For these reasons, the court finds that the agency did not act arbitrarily or capriciously with respect to this factor.

### c.   Negligence or Willfulness

The third factor allows the NIGC to adjust the amount of the fine "based on the degree of fault of the respondent in causing or failing to correct the violation, either through act or omission." 25 C.F.R. § 575.4(d). The Commission adopted the presiding official's conclusion that "[t]he facts of record negate the possibility a reasonable trier of fact could find [plaintiffs'] violations were not negligent (*i.e.*, a result of a lack of ordinary care) or willful (*i.e.*, purposeful and intentional, or reckless)." A.R. 3057. The agency determined that the record precluded a finding that plaintiffs had no role or only an insignificant role regarding the violations. *Id.* The presiding official acknowledged that the Tribe did bear some responsibility for its part in the matter. A.R. 3037. Because of the role of the Tribe, plaintiffs' fine was reduced. *Id.*

34

The court acknowledges plaintiffs' earlier contentions that the NIGC should have considered their claims that the Tribe drafted and presented the parties' agreements, that the Tribe agreed to the modifications, that the Tribe did not inform Gallo the modifications had not been approved, and that the Tribe represented the agreements and arrangements were permissible. *See e.g.,* Docket 53 at 27-29; *id.* at 30-31. While not responsive to the first two factors, these contentions would be relevant here. The record demonstrates, however, that the NIGC did consider the Tribe's role in the matter. A.R. 3037 ("The Chairwoman acknowledges that [plaintiffs] 'were not alone in their actions,' a fact that caused her to reduce the amount of the fine that otherwise could be imposed.") (citation omitted). The Tribe was also cited for four violations of the IGRA and NIGC regulations. A.R. 2511 (Notice of Violation). Because the record indicates that the Tribe's conduct was considered and plaintiffs' fine was reduced in recognition of the Tribe's role, the court finds that the NIGC did not act arbitrarily or capriciously regarding the Tribe's part in the matter.

The remainder of plaintiffs' arguments with respect to this factor are largely based on plaintiffs' lack of intent to violate the law. *See e.g.*, Docket 53 at 27 (". . . Bettor Racing did not engage in any intentional or deceptive conduct in its dealings with the Tribe[.]"). The record indicates that Gallo admitted to "operat[ing] for six months at Flandreau without a contract." A.R. 1772:13-14. The record further demonstrates that Gallo was aware that the NIGC needed to approve management contracts. A.R. 1765:22-24 ("I knew that they had to okay it before I got the license."). As discussed above, plaintiffs admitted to the

35

dates of the unapproved modifications, and the record supports the Commission's conclusion that the "bonus" payment was not viewed as discretionary. Additionally, Gallo was aware that the "bonus" payment would reduce the revenue split due to the Tribe below the level required by the IGRA. A.R. 1895:5 (responding to a question about his understanding of the revenue split that "[The check swap] would wipe it out."). These facts support the Commission's conclusion that plaintiffs were at least negligent with respect to the violations, and there appears to be "a 'rational connection between the facts found and the choice made.' " *Bowman Transp. Inc.*, 419 U.S. at 285-86. Further, as discussed, the Tribe's conduct was taken into consideration, which led to a reduction in the fine imposed. For these reasons, the court finds that the Commission did not act arbitrarily or capriciously regarding this factor.

### d.    Good Faith

The fourth factor enables the chair to reduce the amount of the fine "based on the degree of good faith of the respondent in attempting to achieve rapid compliance after notification of the violation." 25 C.F.R. § 575.4(e). Unlike the other factors that allow the chair to "adjust" the amount of the fine imposed, this factor speaks only to a possible reduction. The Commission agreed with the presiding official that "[t]here is no dispute that [Plaintiffs] did not reimburse the Tribe the sum [which] was due under the management contract." A.R. 3057.

Plaintiffs do not contest that the amount due to the Tribe was not paid, but they argue that the assessment of this factor amounted to a denial of due

36

process, effectively punishing them for exercising their right to appeal the violation. Docket 53 at 31. Additionally, plaintiffs contend that they have been "exceptionally candid" throughout the NIGC's investigation, and that they are only attempting to "defend itself rather than pay any amount which it did not believe it owed[.]". Docket 62 at 18.

The presiding official responded to plaintiffs' first argument, noting that they could pay the amount at issue in order to avoid additional consequences such as interest accrual or "to engender favorable consideration of a potential civil fine or penalty." A.R. 3038-39 n.13. If plaintiffs had prevailed, they would have been given a refund. *Id.* Additionally, plaintiffs' request for a hearing was dependent on the outcome of the summary judgment motions, and it did not weigh against them "because they have exercised their appellate rights." *Id.* Though not cited at length by the Commission, it ultimately adopted the conclusions of the presiding official. A.R. 3057. The court agrees that this factor does not punish plaintiffs for exercising their rights to appeal or contest the fine itself, but only asks whether the fine ultimately imposed should be reduced because plaintiffs complied with the remedial measures set out in the NOV.

Plaintiffs' second argument was also rejected by the presiding official and Commission, both noting that this factor does not consider if plaintiffs acted with good faith in general, but only whether plaintiffs exercised good faith to "comply with the NOV's corrective measure" of reimbursing the Tribe. A.R. 3057. The plain language of the regulation limits the consideration of a party's

37

good faith to "after" the NOV is issued. *See* C.F.R. § 575.4(e); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (deferring to the agency's interpretation of a regulation unless "an 'alternative reading is compelled by the regulation's plain language[.]' ") (citation omitted). The court agrees with the presiding official and Commission that only plaintiffs' good faith effort to comply with the NOV's remedial measure would be considered in this factor's application. Therefore, the agency was correct to limit its inquiry to that particular time frame, and the record supports the conclusion that it did so. For these reasons, the court finds that the Commission did not act arbitrarily or capriciously with respect to this factor. Further, the record supports the agency's assessment of the factors and that the Commission's conclusions were consistent with the facts before it.

**v.    Due Process**

Throughout its briefs, plaintiffs intermittently allege they were prohibited from receiving a hearing or otherwise denied various aspects of due process during the agency proceeding. *See, e.g.*, Docket 53 at 6-7, 31, 35 n.17, 37.[14] For example, plaintiffs contend they were not given an opportunity to engage in

---

[14] In a footnote, plaintiffs allude to "a question as to whether Bettor Racing in fact possesses a *substantive* due process claim." Docket 53 at 35, n.17 (emphasis added). Plaintiffs then cite to a Fourth Circuit district court opinion that applied the rational basis standard of review to the federal Anti-Kickback statute. *Id.* (citing *United States v. Kruse*, 101 F. Supp. 2d. 410, 415 (E.D. Va. 2000)). Plaintiffs do not provide any additional analysis, however, and it is unclear what plaintiffs' substantive (rather than procedural) due process claim is or how plaintiffs meet their burden to overcome the rational basis standard of review. Without support of an essential element of plaintiffs' substantive due process claim, there is nothing for the court to address. *See Everett v. St. Ansgar Hosp.*, 974 F.2d 77, 80 (8th Cir. 1992).

discovery or participate in the NIGC's investigation. Docket 62 at 11, 15-16. These arguments are not presented with a great deal of clarity, but the court will address the procedures followed at the agency level.

The fundamental requirement of due process is the opportunity to be heard. *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817-18 (8th Cir. 2011). The NIGC is given subpoena and deposition power "in any proceeding or investigation pending before the Commission at any stage of such proceeding or investigation." 25 U.S.C. § 2715(d). Any party may request to depose a witness by filing a request with the NIGC or, if a presiding official has been appointed, with the presiding official. 25 C.F.R. § 571.11(a). Commission officials may be served with interrogatories, and NIGC regulations and the Freedom of Information Act govern the inspection of NIGC records. *Id.*; 25 C.F.R. § 571.3; 5 U.S.C § 552.

The IGRA directs the NIGC to set regulations by which opportunities for hearings and appeals may be pursued regarding fines levied by the Commission. 25 U.S.C. § 2713(2). NIGC regulations provide that a party may appeal a notice of violation or proposed civil fine assessment and request a hearing. 25 C.F.R. § 584.3(a). Parties may present relevant written evidence and give an oral argument at the hearing, but the presiding official retains the discretion to allow oral and documentary evidence, as well as cross-examination. 25 C.F.R. § 584.8(a). Alternatively, parties may waive the right to an oral hearing and elect to have the matter determined by the Commission on

the basis of written submissions. 25 C.F.R. § 584.3(c). Parties may also move to submit additional, relevant evidence to supplement the record prior to the Commission's final decision, provided "reasonable grounds" explain the absence of the evidence. 25 C.F.R. § 581.5.

The record shows plaintiffs originally requested an appeal and hearing regarding the notice of violation in June 2011. A.R. 2542; 2558. Following unsuccessful mediation, the parties subsequently submitted a joint motion requesting a deferral of the hearing until after motions have been ruled upon by the presiding official. A.R. 2658. The parties also requested the presiding official to enter a proposed scheduling order attached to the joint motion, with the effect that the hearing date be set "if necessary" after the motions were ruled upon. A.R. 2661. The presiding official adopted the scheduling order on January 27, 2012. A.R. 2662.

Following the civil fine assessment, plaintiffs again appealed and requested a hearing. A.R. 2941; 2944. In the order consolidating the notice of violation and civil fine assessment appeals, the presiding official noted plaintiffs had submitted a request to defer a hearing with respect to the CFA until after summary judgment motions had been considered. A.R. 2992.  The order referenced that the hearing would be held "as provided in my order dated January 27, 2012." *Id.* As discussed, the January 27, 2012, scheduling order contemplated the hearing would be held "if necessary." As the presiding official later explained, whether a hearing would be held "is strictly a matter of the outcome on the parties' motions for summary judgment[.]" A.R. 3039 n.13. The

40

lack of a subsequent hearing appears to be based on the agency's determination, following its grant of summary judgment to the NIGC chair and Tribe, that the hearing would not be necessary as per the scheduling order submitted by the parties.

The preceding discussion and examination of the IGRA and NIGC regulations reveals that plaintiffs were allowed to have subpoenas issued, take depositions, and request information. Plaintiffs could also supplement the record by motion before the Commission reached its final decision. Additionally, plaintiffs were not foreclosed from requesting a hearing, but they agreed to defer the hearing until after the presiding official ruled on the motions for summary judgment, and then only if the hearing was still necessary would it be held. Thus, it appears from the record that plaintiffs were afforded the opportunity to be heard and otherwise afforded due process of law. Plaintiffs' bare allegations to the contrary do not establish that a violation of their rights has occurred.[15]

In sum, the administrative record supports the Commission's conclusions that plaintiffs committed three violations of the IGRA. The same can be said for the Commission's review of the relevant factors the NIGC used to determine the amount of the civil fine assessed against plaintiffs. The court concludes that the agency has given "a 'rational connection between the facts found and the choice[s] made' " throughout the administrative proceeding.

---

[15] Plaintiffs also contend the NIGC was in some way biased because it "is tasked with protecting the Tribe[.]" Docket 53 at 37. This assertion is equally unsubstantiated.

*Bowman Transp. Inc.,* 419 U.S. at 285-86; *see also South Dakota v. United States Dep't of Interior*, 423 F.3d 790, 801 (8th Cir. 2005). Plaintiffs have not demonstrated that the agency acted arbitrarily or capriciously with respect to any of the violations or with respect to the factors used to determine the amount of the fine. Additionally, plaintiffs have not shown they were denied due process of law. Accordingly, the NIGC's and Tribe's motions for summary judgment are granted.

## II.

On June 1, 2012, plaintiffs submitted a memorandum in opposition to the CFA. A.R. 2999. Plaintiffs argued, *inter alia*, that the CFA of $5 million violated the excessive fines clause of the Eighth Amendment.  A.R. 3008-13.[16] In its final decision and order, however, the NIGC agreed with the presiding official's recommendation that it lacked jurisdiction to entertain constitutional claims. A.R. 3058 (observing that the parties "did not address the question of whether IGRA or any other statute confers" such authority). The parties have not contested the NIGC's decision to forego adjudication on this issue; instead, each party has sought summary judgment from this court. Consequently, the merits of plaintiffs' Eighth Amendment claim were not addressed by the agency.

Although uncontested by the parties, this court must first determine whether it has subject matter jurisdiction to address the Eighth Amendment claim which the agency considered but declined to reach.  As a general rule,

---

[16] The NIGC has confirmed that collection proceedings against the amount sought by the fine have begun. Docket 44 at 8.

parties may seek judicial review following an agency proceeding only after exhausting their administrative remedies. *See e.g.*, *Rowden v. Warden*, 89 F.3d 536, 536 (8th Cir. 1996). The exhaustion doctrine serves several purposes, such as promoting judicial economy, aiding judicial review by developing a factual record, protecting agency autonomy, and discouraging deliberate avoidance of administrative procedures. *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 263 n.3 (8th Cir. 1996). There are several exceptions to the doctrine, however, and it is "not a rule to be applied woodenly[.]" *West v. Bergland*, 611 F.2d 710, 715 (8th Cir. 1979); *see also Krempel v. Prairie Island Indian Cmty*, 125 F.3d 621, 623 (8th Cir. 1997) (explaining "the application of the exhaustion doctrine depends on the purposes of exhaustion being served.").

The parties have not provided–and the court is not aware of–any authority that would have required the NIGC to rule on plaintiffs' Eighth Amendment claim. Additionally, even if the NIGC could have addressed this claim during the administrative proceeding and chose not to, this court concludes it can nonetheless reach the merits of the issue for several reasons. First, judicial economy would be undermined, rather than promoted, if this court were to require the agency to revisit the issue. *See Riggin v. Office of Senate Fair Emp't Practices*, 61 F.3d 1563, 1571 (Fed. Cir. 1995) (concluding that remand of a "straightforward" constitutional issue "would not justify the time and effort involved . . ."). Second, judicial review would not be aided by any additional development of the factual record, as the question presented is primarily a legal one that can be answered by the record already developed.

*State of Mo. v. Bowen*, 813 F.2d 864, 871 (8th Cir. 1987). Third, because plaintiffs are alleging a constitutional violation, resolution of such an issue may be more appropriately had in a judicial forum than at the agency level. *Plaquemines Port, Harbor, & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 544 (D.C. Cir. 1988). Finally, because plaintiffs originally presented the issue to the NIGC for resolution, this is not a case where it appears a party is attempting to deliberately avoid administrative procedures. Because the purposes underpinning the exhaustion doctrine are not being threatened, this court will reach the merits of the Eighth Amendment issue in the absence of a specific ruling by the NIGC below.

## LEGAL STANDARD

Because the court is not being asked to review an administrative decision, the standard for summary judgment set forth in Rule 56 applies. As previously discussed, summary judgment may be awarded when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000). The court views the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). As the Eighth Circuit has explained, "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *United States v. Premises Known as 6040 Wentworth Ave. S., Minneapolis, Hennepin Cnty. Minn.*, 123

F.3d 685, 687-88 (8th Cir. 1997) (citing *Crain v. Bd. of Police Comm'rs*, 920

F.2d 1402, 1405-06 (8th Cir. 1990).

The Eighth Amendment provides, "Excessive bail shall not be required,

nor excessive fines imposed, nor cruel and unusual punishments inflicted."

U.S. Const. amend. VIII. The Supreme Court has held that the Excessive Fines

Clause of the Eighth Amendment applies not only to criminal sanctions, but to

civil assessments that are punitive in nature. *Austin v. United States*, 509 U.S.

602, 610 (1993) (explaining the relevant inquiry is not whether the assessment

is criminal or civil, "but whether it is punishment."). For the purposes of its

forthcoming analysis, this court will assume, as plaintiffs suggest, that a civil

fine imposed under 25 U.S.C. § 2713(a)(1) is equivalent to "punishment" and

therefore subject to the Eighth Amendment's limitations. *See* Docket 53 at 33-

34.

To determine whether a fine runs afoul of the Eighth Amendment, the

Supreme Court has explained that, "The amount of the forfeiture must bear

some relationship to the gravity of the offense that it is designed to punish."

*United States v. Bajakajian*, 524 U.S. 321, 334 (1998). After concluding that

neither the text nor history of the Eighth Amendment illuminates the contours

of the Excessive Fines Clause, the Court adopted "the standard of gross

disproportionality articulated in [its] Cruel and Unusual Punishment Clause

precedents." *Id.* at 336. From these precedents, the Court established two

prudential considerations: first, "that judgments about the appropriate

punishment for an offense belong in the first instance to the legislature," and

second, "that any judicial determination regarding the gravity of a particular [offense] will be inherently imprecise." *Id.* Because there is no bright line to determine whether a particular fine may be grossly disproportionate, the Court left that task to the lower courts. *Austin*, 509 U.S. at 622-23.

Responding to the Supreme Court's guidance, the Eighth Circuit has adopted a two-pronged test to determine whether an assessment is constitutionally infirm. The first prong requires the challenger to "mak[e] a prima facie showing of 'gross disproportionality.' " *Wentworth Ave.*, 123 F.3d at 688 (quoting *United States v. Bieri*, 68 F.3d 232, 236 (8th Cir. 1995)). If the challenger meets its initial burden, the court then considers whether the disproportionality "reach[es] such a level of excessiveness that in justice the punishment is more criminal than the [offense]." *Id.* A number of factors are considered to aid the court's determination of whether a fine is "grossly disproportional," such as the duration of the conduct that led to the fine, the gravity of the offense versus the severity of the sanction, and the value of what was forfeited. *United States v. Dodge Caravan*, 387 F.3d 758, 763 (8th Cir. 2004) (citing *Bieri*, 68 F.3d at 236). Additionally, a court should consider the benefit gained by the offending party, that party's motive and culpability, and the extent to which that party's "interest and the enterprise itself are tainted" by the unlawful conduct. *Id.* There may be other factors to consider, and not all factors may apply to a given case, thus the Eighth Circuit has acknowledged that this inquiry is dependent on the facts before the court. *Id.*  Nonetheless, if a fine is near or within the permissible statutory range, it "almost certainly is

46

not excessive." *United States v. Moyer*, 313 F.3d 1082, 1086 (8th Cir. 2002)
(citing *United States v. Sherman*, 262 F.3d 784 (8th Cir. 2001) *vacated but
reinstated by United States v. Diaz*, 296 F.3d 680 (8th Cir 2002) (en banc)).

Before applying the standards set forth, however, the court will address
plaintiffs' use of the Fourteenth Amendment Due Process Clause analysis
regarding awards of punitive damages, rather than the Eighth Amendment
Excessive Fines Clause analysis. *See, e.g.*, Docket 53 at 34 (citing *Cooper
Indus. Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001); *Gore*, 517 U.S. at
574; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).
These cases establish three criteria to assess in order to determine whether a
jury award of punitive damages violates Due Process: (1) the degree of
reprehensibility of the defendant's conduct; (2) the difference between the
actual harm caused and the punitive damages awarded; and (3) the difference
between the punitive damages awarded and civil penalties awarded in similar
cases. *Gore*, 517 U.S. at 575. These three "guideposts" are meant to ensure
that proper notice of the penalty is associated with the conduct. *Id.* at 574.

The Supreme Court has observed that the nature of punitive damages
awards amounts to a "private fine" issued by a jury designed to punish the
offender. *Cooper*, 532 U.S. at 432. In the present case, however, there is not a
state law at issue that would make the Fourteenth Amendment's Due Process
Clause the appropriate vehicle to examine the claim. *See, e.g.*, *Cooper*, 532 U.S.
at 433 (discussing the Fourteenth Amendment's limits on the ability of states
to impose penalties and punitive damages). Additionally, there is no jury award

47

of punitive damages before the court, much less an award several times in excess of the actual damage inflicted by a tortfeasor. *See State Farm.*, 538 U.S. at 425 (noting with disapproval an award ratio of 145-to-1). Whatever analogy may be drawn between the two concepts, the Eighth Amendment's "gross disproportionality" standard must be applied. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (explaining "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of '[due process],' must be the guide[.]' "). The court will nonetheless construe the due process arguments as if they were made in the Eighth Amendment context, as several of the factors from the latter appear to overlap with the "guideposts" from the former.

## DISCUSSION

Because cross motions for summary judgment are before the court, it will first consider the motions of the NIGC and Tribe. Thus, the evidence will be viewed in the light most favorable to plaintiffs.

For the first violation, operating without an approved management contract from September 24, 2004, to March 16, 2005, the NIGC assessed a fine of $1 million ($5,747 per day). A.R. 3057. For the second violation, operating under two unapproved management contract modifications from February 1, 2007, to April 4, 2010, the NIGC assessed a fine of $2 million ($1,747 per day). A.R. 3058. For the third violation, holding a proprietary interest in Royal River Racing from August 31, 2006, to April 4, 2010, the NIGC

48

assessed a fine of $2 million ($1,523 per day). *Id.* The civil fine ultimately leveled against plaintiffs totaled $5 million. A.R. 3044. As discussed above, the NIGC determined plaintiffs had incurred a financial benefit of $4,544,755 as a result of these violations.

Plaintiffs ground their argument that the fine is *prima facie* grossly disproportionate on several assertions. With respect to the gravity of the offense versus the severity of the sanction, plaintiffs insist that the NIGC's equivalence of a "substantial" violation with a "serious" violation was improper. Docket 53 at 34-35.  Further, plaintiffs argue they had no intention of violating the law, but that the Tribe was largely to blame for any violations that did occur; thus, plaintiffs' lack of culpability cannot justify the fine. Docket 53 at 35-36. Although more appropriate to due process analysis, plaintiffs note the relatively low fine of $750,000 facing the Tribe if it violates the terms of the settlement agreement in comparison to the $5 million fine imposed against plaintiffs. Docket 53 at 36. Plaintiffs also contend that "although a fine may be within the maximum penalty prescribed by federal regulation, it may still be deemed excessive." Docket 53 at 34 (citing *United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 941-42 (S.D. Ohio 2002); *United States v. Valley Steel Prods. Co.*, 765 F. Supp. 752 (C.I.T. 1991)).

Although the evidence is viewed in plaintiffs' favor, their arguments do not make a *prima facie* showing that the fine is grossly disproportionate. First, with respect to the Supreme Court's observation in *United States v. Bajakajian*, 424 U.S. 321, 336 (1998), that "judgments about the appropriate punishment

49

for an offense belong in the first instance to the legislature," Congress has provided just such a judgment here. Pursuant to its statutory authority, the chair of the NIGC may impose a civil fine "not to exceed $25,000 per violation" against "a management contractor engaged in gaming for any violation of any provision" of the IGRA, regulations promulgated by the NIGC, or approved tribal regulations, ordinances, or resolutions. 25 U.S.C. § 2713(a)(1). The IGRA gives the NIGC additional authority to enact its own regulations for the assessment and collection of civil fines. *Id.*; 25 U.S.C. § 2706(a)(2). Under its regulations, the NIGC may treat ongoing, daily violations as separate violations for purposes of assessing the total fine. 25 C.F.R. § 575.3. Thus, Congress has established a statutory framework for the enforcement of the IGRA to be administered by the NIGC, and the NIGC has been entrusted to promulgate rules to achieve that end.

Second, with respect to the fine itself, the Commission concluded plaintiffs had been in violation of various parts of the IGRA and NIGC regulations for a period of time totaling 2,632 days. A.R. 3057-58. Although there is overlap during the days when plaintiffs operated Royal River Racing under two unapproved contract modifications and the days plaintiffs held a proprietary interest in the operation, each constitutes an ongoing, separate violation that the NIGC is permitted to assess individually. *See* 25 U.S.C. §§ 2713(a)(1); 2710(b)(2)(A)); 2702(2); 2711; 25 C.F.R. § 575.3.[17] These

---

[17] Even if the court were to consider only the period of time during which plaintiffs operated without an approved management contract and under the

statutory and regulatory provisions do not carry a scienter requirement before a violation can be sanctioned, and plaintiffs have provided no authority to the contrary.

The NIGC also determined plaintiffs were able to retain approximately $4,544,755 in revenue that should have gone to the Tribe as a result of their violations during this time. A.R. 3055. Plaintiffs do not dispute this amount, but rather who is to blame for the Tribe's loss. *See, e.g.*, Docket 62 at 20 ("There is an even greater dispute as to whether Bettor Racing caused the harm of which the Tribe complains."). The $5 million fine itself does not appear disproportionate to the duration of the offending conduct or what plaintiffs received as a result of the offending conduct. *See United States v. Alexander*, 108 F.3d 853, 857 (8th Cir. 1997) (approving the comparison between the extent of the offense and the amount of the forfeiture assessed).

Regarding the gravity of the offenses, plaintiffs' primary contention is that they did not intend to violate the law and that the Tribe bears its own responsibility for the violations that occurred. *See* Docket 53 at 35. Accepting that plaintiffs did not intend to violate the law would lessen their culpability for purposes of assessing the total amount of an appropriate fine. It would not, however, mean that the IGRA or NIGC regulations were not violated, or that those violations did not continue to occur over a period of several years, which allowed plaintiffs to receive over $4 million dollars owed to the Tribe. Accepting that plaintiffs acted with the cooperation of the Tribe would also reduce

unapproved modifications, it would amount to a duration of 1,319 days (a period of over three and a half years).

plaintiffs' own culpability to the same extent described above, which appears to be why the NIGC reduced the amount of the fine it ultimately imposed. Although discussed more fully below, the NIGC did not assess the maximum amount permissible under the IGRA and NIGC regulations for plaintiffs' violations. That the agency chose not to do so reflects its determination that plaintiffs did not deserve as harsh of a penalty as the agency may impose on worse offenders. To this end, plaintiffs' argument that "some wrongs are more blameworthy than others" is correct. Docket 53 at 36 (quoting *Gore*, 517 U.S. at 575). But it does not follow that plaintiffs are therefore blameless or that the ongoing violations themselves were not grave. Plaintiffs' collateral assertion, for which they provide no authority, that it was impermissible for the NIGC to equate a "substantial" violation for a "serious" violation during the assessment phase, is without merit for reasons already discussed.[18]

Although, as plaintiffs contend, the Tribe faces a relatively smaller fee if it violates the terms of its settlement agreement, the key consideration is not the size of that fine but the fact that the Tribe accepted its responsibility and did, in fact, settle with the NIGC. Had the Tribe not done so, it faced the same

---

[18] The court would not consider the agency's interpretation of its own regulation if that regulation violated the Constitution. *South Dakota v. United States Dep't of the Interior*, 423 F.3d 790, 799 (8th Cir. 2005). While plaintiffs may believe that is the case, they have not provided any authority beyond conclusory statements to support such a result. Moreover, the plain meaning of the two words indicates they are similar. *Compare* Dictionary.com, http://dictionary.reference.com/browse/substantial (last visited Sept. 3, 2014)(defining "substantial" as "of ample or considerable amount, quantity, etc.") *with* Dictionary.com, http://dictionary.reference.com/browse/serious (last visited Sept. 3, 2014) (defining "serious" as "weighty or important.").

$25,000 per violation per day penalty. A.R. 2531. To compare the Tribe's potential fine for violating the settlement agreement with the fine assessed against plaintiffs under these circumstances is inapposite.

Additionally, because each daily violation could have been assessed as a separate violation carrying its own fine of up to $25,000, the maximum fine plaintiffs faced was over $65 million. A.R. 3040.[19] The $5 million assessment against plaintiffs represents roughly one-thirteenth of the maximum, a fine that is "almost certainly is not excessive." *United States v. Moyer*, 313 F.3d 1082, 1086 (8th Cir. 2002) (citing *United States v. Sherman*, 262 F.3d 784 (8th Cir. 2001) *vacated but reinstated by United States v. Diaz*, 296 F.3d 680 (8th Cir 2002) (en banc)). The two nonbinding cases plaintiffs cite to refute this presumption are not persuasive.[20] In the first, *United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 942 (S.D. Ohio. 2002), the court merely restates the defendant's argument that a fine within the statutory maximum may yet be excessive. No authority for the statement is provided, nor does it appear that the court adopts the statement as its holding. The court then cites

---

[19] The presiding official noted the maximum fine that could have been assessed totaled $65,755,000. A.R. 3040. The Commission's final decision and order, however, appears to set the number of days plaintiffs were in violation, and thus subject to separate fines, at 2,632 days. A.R. 3057. At $25,000 per day, this would constitute a maximum fine of $65,800,000.

[20] Plaintiffs later cite to the block of punitive damages and due process cases, which were discussed above, in support of this same assertion. Docket 64 at 19 (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). For the reasons already stated, these cases do not provide the applicable legal standard to be used by the court.

the second case for the proposition that whether a fine is excessive cannot be determined before the penalty is actually assessed. *Id.* (citing *United States v. Valley Steel Prod. Co.*, 765 F. Supp. 752 (C.I.T. 1991). That is not the case where, as here, the fine has not only been assessed but the NIGC has begun collection proceedings.

As the Supreme Court has directed, "The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian,* 524 U.S. at 334. Viewing the evidence in the light most favorable to plaintiffs does not show an absence of a relationship between the $5 million fine and the ongoing violations of the IGRA and NIGC regulations. The court concludes plaintiffs have not met their burden of establishing a *prima facie* showing of gross disproportionality, or that the agency abused its discretion to assess the penalty as it did. Because plaintiffs have failed to meet their burden, summary judgment in favor of the NIGC and Tribe is granted.

## CONCLUSION

Plaintiffs have failed to show the Commission acted arbitrarily or capriciously with respect to its determination that plaintiff violated several provisions of the IGRA and NIGC regulations. Plaintiffs have also failed to show the Commission acted arbitrarily or capriciously regarding the factors used to assess an appropriate civil fine for those violations. Additionally, plaintiffs were not denied due process of law during the agency proceeding. Finally, plaintiffs have failed to make a *prima facie* showing of gross disproportionality with respect to the amount of the civil fine. Accordingly, it is

54

ORDERED that the motions for summary judgment by the NIGC (Docket 57) and by the Tribe (Docket 60) are granted.

IT IS FURTHER ORDERED that the motion for summary judgment by Bettor Racing, Inc., and J. Randy Gallo (Docket 52), is denied.

Dated September 19, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE